## CLINTON *v.* JONES

No. 95–1853.   Argued January 13, 1997—Decided May 27, 1997

682

*Robert S. Bennett* argued the cause for petitioner. With him on the briefs were *Carl S. Rauh, Alan Kriegel, Amy R. Sabrin,* and *David A. Strauss.*

*Acting Solicitor General Dellinger* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Malcolm L. Stewart,* and *Douglas N. Letter.*

684

*Gilbert K. Davis* argued the cause for respondent. With him on the brief was *Joseph Cammarata*.\*

JUSTICE STEVENS delivered the opinion of the Court.

This case raises a constitutional and a prudential question concerning the Office of the President of the United States. Respondent, a private citizen, seeks to recover damages from the current occupant of that office based on actions allegedly taken before his term began. The President submits that in all but the most exceptional cases the Constitution requires federal courts to defer such litigation until his term ends and that, in any event, respect for the office warrants such a stay. Despite the force of the arguments supporting the President's submissions, we conclude that they must be rejected.

I

Petitioner, William Jefferson Clinton, was elected to the Presidency in 1992, and reelected in 1996. His term of office expires on January 20, 2001. In 1991 he was the Governor of the State of Arkansas. Respondent, Paula Corbin Jones, is a resident of California. In 1991 she lived in Arkansas, and was an employee of the Arkansas Industrial Development Commission.

On May 6, 1994, she commenced this action in the United States District Court for the Eastern District of Arkansas by filing a complaint naming petitioner and Danny Ferguson, a former Arkansas State Police officer, as defendants. The

*\*John C. Jeffries, Jr.,* and *Pamela S. Karlan* filed a brief for Law Professors as *amicus curiae* urging reversal.

*Christopher A. Hansen* and *Steven R. Shapiro* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

Briefs of *amicus curiae* were filed for the Coalition of American Veterans by *Laurence A. Elgin;* and for Law Professors by *Ronald D. Rotunda, Albert E. Jenner, Jr., Stephen B. Burbank, William Cohen, Geoffrey P. Miller, Robert F. Nagel,* and *Richard Parker.*

complaint alleges two federal claims, and two state-law claims over which the federal court has jurisdiction because of the diverse citizenship of the parties.[1]  As the case comes to us, we are required to assume the truth of the detailed— but as yet untested—factual allegations in the complaint.

Those allegations principally describe events that are said to have occurred on the afternoon of May 8, 1991, during an official conference held at the Excelsior Hotel in Little Rock, Arkansas.  The Governor delivered a speech at the conference; respondent—working as a state employee—staffed the registration desk.  She alleges that Ferguson persuaded her to leave her desk and to visit the Governor in a business suite at the hotel, where he made "abhorrent"[2] sexual advances that she vehemently rejected.  She further claims that her superiors at work subsequently dealt with her in a hostile and rude manner, and changed her duties to punish her for rejecting those advances.  Finally, she alleges that after petitioner was elected President, Ferguson defamed her by making a statement to a reporter that implied she had accepted petitioner's alleged overtures, and that various persons authorized to speak for the President publicly branded her a liar by denying that the incident had occurred.

Respondent seeks actual damages of $75,000 and punitive damages of $100,000.  Her complaint contains four counts. The first charges that petitioner, acting under color of state law, deprived her of rights protected by the Constitution, in violation of Rev. Stat. § 1979, 42 U. S. C. § 1983.  The second charges that petitioner and Ferguson engaged in a conspiracy to violate her federal rights, also actionable under federal law.  See Rev. Stat. § 1980, 42 U. S. C. § 1985.  The third is a state common-law claim for intentional infliction of emotional distress, grounded primarily on the incident at the

---

[1] See 28 U. S. C. § 1332.  Jurisdiction over the federal claims is authorized by 28 U. S. C. §§ 1331 and 1343.

[2] Complaint ¶ 26.

hotel. The fourth count, also based on state law, is for defamation, embracing both the comments allegedly made to the press by Ferguson and the statements of petitioner's agents. Inasmuch as the legal sufficiency of the claims has not yet been challenged, we assume, without deciding, that each of the four counts states a cause of action as a matter of law. With the exception of the last charge, which arguably may involve conduct within the outer perimeter of the President's official responsibilities, it is perfectly clear that the alleged misconduct of petitioner was unrelated to any of his official duties as President of the United States and, indeed, occurred before he was elected to that office.[3]

## II

In response to the complaint, petitioner promptly advised the District Court that he intended to file a motion to dismiss on grounds of Presidential immunity, and requested the court to defer all other pleadings and motions until after the immunity issue was resolved.[4] Relying on our cases holding that immunity questions should be decided at the earliest possible stage of the litigation, 858 F. Supp. 902, 905 (ED Ark. 1994), our recognition of the "'singular importance of the President's duties,'" id., at 904 (quoting Nixon v. Fitzgerald, 457 U. S. 731, 751 (1982)), and the fact that the question did not require any analysis of the allegations of the complaint, 858 F. Supp., at 905, the court granted the request. Petitioner thereupon filed a motion "to dismiss . . . without prejudice and to toll any statutes of limitation [that may be applicable] until he is no longer President, at which time the plaintiff

---

[3] As the matter is not before us, see Jones v. Clinton, 72 F. 3d 1354, 1359, n. 7 (CA8 1996), we do not address the question whether the President's immunity from damages liability for acts taken within the "outer perimeter" of his official responsibilities provides a defense to the fourth count of the complaint. See Nixon v. Fitzgerald, 457 U. S. 731, 756 (1982).

[4] Record, Doc. No. 9; see 858 F. Supp. 902, 904 (ED Ark. 1994).

may refile the instant suit." Record, Doc. No. 17. Extensive submissions were made to the District Court by the parties and the Department of Justice.[5]

The District Judge denied the motion to dismiss on immunity grounds and ruled that discovery in the case could go forward, but ordered any trial stayed until the end of petitioner's Presidency. 869 F. Supp. 690 (ED Ark. 1994). Although she recognized that a "thin majority" in *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982), had held that "the President has absolute immunity from civil damage actions arising out of the execution of official duties of office," she was not convinced that "a President has absolute immunity from civil causes of action arising prior to assuming the office."[6] She was, however, persuaded by some of the reasoning in our opinion in *Fitzgerald* that deferring the trial if one were required would be appropriate.[7] 869 F. Supp., at 699–700. Relying in part on the fact that respondent had failed to bring her complaint until two days before the 3-year period of limitations expired, she concluded that the public interest in avoiding litigation that might hamper the President in conducting the duties of his office outweighed any demonstrated need for an immediate trial. *Id.*, at 698–699.

Both parties appealed. A divided panel of the Court of Appeals affirmed the denial of the motion to dismiss, but because it regarded the order postponing the trial until the

---

[5] See App. to Pet. for Cert. 53.

[6] 869 F. Supp., at 698. She explained: "Nowhere in the Constitution, congressional acts, or the writings of any judge or scholar, may any credible support for such a proposition be found. It is contrary to our form of government, which asserts as did the English in the Magna Carta and the Petition of Right, that even the sovereign is subject to God and the law." *Ibid.*

[7] Although, as noted above, the District Court's initial order permitted discovery to go forward, the court later stayed discovery pending the outcome of the appeals on the immunity issue. 879 F. Supp. 86 (ED Ark. 1995).

President leaves office as the "functional equivalent" of a grant of temporary immunity, it reversed that order. 72 F. 3d 1354, 1361, n. 9, 1363 (CA8 1996). Writing for the majority, Judge Bowman explained that "the President, like all other government officials, is subject to the same laws that apply to all other members of our society," *id.*, at 1358, that he could find no "case in which any public official ever has been granted any immunity from suit for his unofficial acts," *ibid.*, and that the rationale for official immunity "is inapposite where only personal, private conduct by a President is at issue," *id.*, at 1360. The majority specifically rejected the argument that, unless immunity is available, the threat of judicial interference with the Executive Branch through scheduling orders, potential contempt citations, and sanctions would violate separation-of-powers principles. Judge Bowman suggested that "judicial case management sensitive to the burdens of the presidency and the demands of the President's schedule" would avoid the perceived danger. *Id.*, at 1361.

In dissent, Judge Ross submitted that even though the holding in *Fitzgerald* involved official acts, the logic of the opinion, which "placed primary reliance on the prospect that the President's discharge of his constitutional powers and duties would be impaired if he were subject to suits for damages," applies with equal force to this case. 72 F. 3d, at 1367. In his view, "unless exigent circumstances can be shown," all private actions for damages against a sitting President must be stayed until the completion of his term. *Ibid.* In this case, Judge Ross saw no reason why the stay would prevent respondent from ultimately obtaining an adjudication of her claims.

In response to the dissent, Judge Beam wrote a separate concurrence. He suggested that a prolonged delay may well create a significant risk of irreparable harm to respondent because of an unforeseeable loss of evidence or the possible

death of a party. *Id.*, at 1363–1364. Moreover, he argued that in civil rights cases brought under § 1983 there is a "public interest in an ordinary citizen's timely vindication of . . . her most fundamental right against alleged abuse of power by government officials." *Id.*, at 1365. In his view, the dissent's concern about judicial interference with the functioning of the Presidency was "greatly overstated." *Ibid.* Neither the involvement of prior Presidents in litigation, either as parties or as witnesses, nor the character of this "relatively uncomplicated civil litigation," indicated that the threat was serious. *Id.*, at 1365–1366. Finally, he saw "no basis for staying discovery or trial of the claims against Trooper Ferguson." *Id.*, at 1366.[8]

## III

The President, represented by private counsel, filed a petition for certiorari. The Acting Solicitor General, representing the United States, supported the petition, arguing that the decision of the Court of Appeals was "fundamentally mistaken" and created "serious risks for the institution of the Presidency."[9] In her brief in opposition to certiorari, respondent argued that this "one-of-a-kind case is singularly inappropriate" for the exercise of our certiorari jurisdiction because it did not create any conflict among the Courts of Appeals, it "does not pose any conceivable threat to the functioning of the Executive Branch," and there is no precedent supporting the President's position.[10]

While our decision to grant the petition, 518 U. S. 1016 (1996), expressed no judgment concerning the merits of the case, it does reflect our appraisal of its importance. The

---

[8] Over the dissent of Judge McMillian, the Court of Appeals denied a suggestion for rehearing en banc. 81 F. 3d 78 (CA8 1996).

[9] Brief for United States in Support of Petition 5.

[10] Brief in Opposition 8, 10, 23.

representations made on behalf of the Executive Branch as to the potential impact of the precedent established by the Court of Appeals merit our respectful and deliberate consideration.

It is true that we have often stressed the importance of avoiding the premature adjudication of constitutional questions.[11] That doctrine of avoidance, however, is applicable to the entire Federal Judiciary, not just to this Court, cf. *Arizonans for Official English* v. *Arizona, ante,* p. 43, and comes into play after the court has acquired jurisdiction of a case. It does not dictate a discretionary denial of every certiorari petition raising a novel constitutional question. It does, however, make it appropriate to identify two important constitutional issues not encompassed within the questions presented by the petition for certiorari that we need not address today.[12]

---

[11] As we have explained: "'If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.' *Spector Motor Service* v. *McLaughlin,* 323 U. S. 101, 105 [(1944)]. It has long been the Court's 'considered practice not to decide abstract, hypothetical or contingent questions . . . or to decide any constitutional question in advance of the necessity for its decision . . . or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied . . . or to decide any constitutional question except with reference to the particular facts to which it is to be applied . . . .' *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450, 461 [(1945)]. 'It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.' *Burton* v. *United States,* 196 U. S. 283, 295 [(1905)]." *Rescue Army* v. *Municipal Court of Los Angeles,* 331 U. S. 549, 570, n. 34 (1947).

[12] The two questions presented in the certiorari petition are: "1. Whether the litigation of a private civil damages action against an incumbent President must in all but the most exceptional cases be deferred until the President leaves office"; and "2. Whether a district court,

First, because the claim of immunity is asserted in a federal court and relies heavily on the doctrine of separation of powers that restrains each of the three branches of the Federal Government from encroaching on the domain of the other two, see, *e. g.*, *Buckley* v. *Valeo*, 424 U. S. 1, 122 (1976) *(per curiam)*, it is not necessary to consider or decide whether a comparable claim might succeed in a state tribunal. If this case were being heard in a state forum, instead of advancing a separation-of-powers argument, petitioner would presumably rely on federalism and comity concerns,[13] as well as the interest in protecting federal officials from possible local prejudice that underlies the authority to remove certain cases brought against federal officers from a state to a federal court, see 28 U. S. C. § 1442(a); *Mesa* v. *California*, 489 U. S. 121, 125–126 (1989). Whether those concerns would present a more compelling case for immunity is a question that is not before us.

Second, our decision rejecting the immunity claim and allowing the case to proceed does not require us to confront the question whether a court may compel the attendance of the President at any specific time or place. We assume that the testimony of the President, both for discovery and for use at trial, may be taken at the White House at a time that

as a proper exercise of judicial discretion, may stay such litigation until the President leaves office." Our review is confined to these issues. See this Court's Rule 14.1(a).

[13] Because the Supremacy Clause makes federal law "the supreme Law of the Land," Art. VI, cl. 2, any direct control by a state court over the President, who has principal responsibility to ensure that those laws are "faithfully executed," Art. II, § 3, may implicate concerns that are quite different from the interbranch separation-of-powers questions addressed here. Cf., *e. g.*, *Hancock* v. *Train*, 426 U. S. 167, 178–179 (1976); *Mayo* v. *United States*, 319 U. S. 441, 445 (1943). See L. Tribe, American Constitutional Law 513 (2d ed. 1988) ("[A]bsent explicit congressional consent no state may command federal officials . . . to take action in derogation of their . . . federal responsibilities").

will accommodate his busy schedule, and that, if a trial is held, there would be no necessity for the President to attend in person, though he could elect to do so.[14]

## IV

Petitioner's principal submission—that "in all but the most exceptional cases," Brief for Petitioner i, the Constitution affords the President temporary immunity from civil damages litigation arising out of events that occurred before he took office—cannot be sustained on the basis of precedent.

Only three sitting Presidents have been defendants in civil litigation involving their actions prior to taking office. Complaints against Theodore Roosevelt and Harry Truman had been dismissed before they took office; the dismissals were affirmed after their respective inaugurations.[15] Two companion cases arising out of an automobile accident were filed against John F. Kennedy in 1960 during the Presidential campaign.[16] After taking office, he unsuccessfully argued that his status as Commander in Chief gave him a right to a stay under the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U. S. C. App. §§ 501–525. The motion for a stay was denied by the District Court, and the matter was settled out of court.[17] Thus, none of those cases sheds any light on the constitutional issue before us.

The principal rationale for affording certain public servants immunity from suits for money damages arising out of

---

[14] Although Presidents have responded to written interrogatories, given depositions, and provided videotaped trial testimony, see *infra*, at 704–705, no sitting President has ever testified, or been ordered to testify, in open court.

[15] See *People ex rel. Hurley* v. *Roosevelt*, 179 N. Y. 544, 71 N. E. 1137 (1904); *DeVault* v. *Truman*, 354 Mo. 1193, 194 S. W. 2d 29 (1946).

[16] See Complaints in *Bailey* v. *Kennedy*, No. 757,200, and *Hills* v. *Kennedy*, No. 757,201 (Cal. Super. Ct., filed Oct. 27, 1960).

[17] See 72 F. 3d, at 1362, n. 10.

their official acts is inapplicable to unofficial conduct. In cases involving prosecutors, legislators, and judges we have repeatedly explained that the immunity serves the public interest in enabling such officials to perform their designated functions effectively without fear that a particular decision may give rise to personal liability.[18] We explained in *Ferri* v. *Ackerman*, 444 U. S. 193 (1979):

> "As public servants, the prosecutor and the judge represent the interest of society as a whole. The conduct of their official duties may adversely affect a wide variety of different individuals, each of whom may be a potential source of future controversy. The societal interest in providing such public officials with the maximum ability to deal fearlessly and impartially with the public at large has long been recognized as an acceptable justification for official immunity. The point of immunity for such officials is to forestall an atmosphere of intimidation that would conflict with their resolve to perform their designated functions in a principled fashion." *Id.,* at 202–204.

That rationale provided the principal basis for our holding that a former President of the United States was "entitled to absolute immunity from damages liability predicated on his official acts," *Fitzgerald,* 457 U. S., at 749. See *id.,* at 752 (citing *Ferri* v. *Ackerman*). Our central concern was to

---

[18] Some of these cases defined the immunities of state and local officials in actions filed under 42 U. S. C. § 1983. See, *e. g., Imbler* v. *Pachtman,* 424 U. S. 409, 422–423 (1976) (prosecutorial immunity); *Tenney* v. *Brandhove,* 341 U. S. 367, 376–377 (1951) (legislative immunity); *Pierson* v. *Ray,* 386 U. S. 547, 554–555 (1967) (judicial immunity). The rationale underlying our official immunity jurisprudence in cases alleging constitutional violations brought against federal officials is similar. See, *e. g., Butz* v. *Economou,* 438 U. S. 478, 500–501 (1978).

694

avoid rendering the President "unduly cautious in the discharge of his official duties." 457 U. S., at 752, n. 32.[19]

This reasoning provides no support for an immunity for *unofficial* conduct. As we explained in *Fitzgerald,* "the sphere of protected action must be related closely to the immunity's justifying purposes." *Id.,* at 755. Because of the President's broad responsibilities, we recognized in that case an immunity from damages claims arising out of official acts extending to the "outer perimeter of his authority." *Id.,* at 757. But we have never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity. See *id.,* at 759 (Burger, C. J., concurring) (noting that "a President, like Members of Congress, judges, prosecutors, or congressional aides—all having absolute immunity—are not immune for acts outside official duties"); see also *id.,* at 761, n. 4.

Moreover, when defining the scope of an immunity for acts clearly taken *within* an official capacity, we have applied a functional approach. "Frequently our decisions have held that an official's absolute immunity should extend only to acts in performance of particular functions of his office." *Id.,* at 755. Hence, for example, a judge's absolute immunity does not extend to actions performed in a purely administra-

---

[19] Petitioner draws our attention to dicta in *Fitzgerald,* which he suggests are helpful to his cause. We noted there that "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government," 457 U. S., at 751, and suggested further that "[c]ognizance of . . . personal vulnerability frequently could distract a President from his public duties," *id.,* at 753. Petitioner argues that in this aspect the Court's concern was parallel to the issue he suggests is of great importance in this case, the possibility that a sitting President might be distracted by the need to participate in litigation during the pendency of his office. In context, however, it is clear that our dominant concern was with the diversion of the President's attention during the decisionmaking process caused by needless worry as to the possibility of damages actions stemming from any particular official decision. Moreover, *Fitzgerald* did not present the issue raised in this case because that decision involved claims against a *former* President.

tive capacity. See *Forrester* v. *White*, 484 U. S. 219, 229–230 (1988). As our opinions have made clear, immunities are grounded in "the nature of the function performed, not the identity of the actor who performed it." *Id.*, at 229.

Petitioner's effort to construct an immunity from suit for unofficial acts grounded purely in the identity of his office is unsupported by precedent.

V

We are also unpersuaded by the evidence from the historical record to which petitioner has called our attention. He points to a comment by Thomas Jefferson protesting the subpoena *duces tecum* Chief Justice Marshall directed to him in the Burr trial,[20] a statement in the diaries kept by Senator William Maclay of the first Senate debates, in which then-Vice President John Adams and Senator Oliver Ellsworth are recorded as having said that "the President personally [is] not . . . subject to any process whatever," lest it be "put . . . in the power of a common Justice to exercise any Authority over him and Stop the Whole Machine of Government,"[21] and to a quotation from Justice Story's Commentaries on the Constitution.[22] None of these sources sheds much light on the question at hand.[23]

---

[20] In Jefferson's view, the subpoena jeopardized the separation of powers by subjecting the Executive Branch to judicial command. See 10 Works of Thomas Jefferson 404, n. (P. Ford ed. 1905); *Fitzgerald*, 457 U. S., at 751, n. 31 (quoting Jefferson's comments).

[21] 9 Documentary History of First Federal Congress of the United States 168 (K. Bowling & H. Veit eds. 1988) (Diary of William Maclay).

[22] See 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418–419 (1833).

[23] Jefferson's argument provides little support for petitioner's position. As we explain later, the prerogative Jefferson claimed was denied him by the Chief Justice in the very decision Jefferson was protesting, and this Court has subsequently reaffirmed that holding. See *United States* v. *Nixon*, 418 U. S. 683 (1974). The statements supporting a similar proposition recorded in Senator Maclay's diary are inconclusive of the issue before us here for the same reason. In addition, this material is hardly proof of the unequivocal common understanding at the time of the founding. Immediately after mentioning the positions of Adams and Ellsworth,

Respondent, in turn, has called our attention to conflicting historical evidence. Speaking in favor of the Constitution's adoption at the Pennsylvania Convention, James Wilson— who had participated in the Philadelphia Convention at which the document was drafted—explained that, although the President "is placed [on] high," "not a single privilege is annexed to his character; far from being above the laws, he is amenable to them in his private character as a citizen, and in his public character by impeachment." 2 J. Elliot, Debates on the Federal Constitution 480 (2d ed. 1863) (emphasis deleted). This description is consistent with both the doctrine of Presidential immunity as set forth in *Fitzgerald* and rejection of the immunity claim in this case. With respect to acts taken in his "public character"—that is, official acts— the President may be disciplined principally by impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts.

In the end, as applied to the particular question before us, we reach the same conclusion about these historical materials that Justice Jackson described when confronted with an issue concerning the dimensions of the President's power.

---

Maclay went on to point out in his diary that he virulently disagreed with them, concluding that his opponents' view "[s]hows clearly how amazingly fond of the old leven many People are." Diary of Maclay 168.

Finally, Justice Story's comments in his constitutional law treatise provide no substantial support for petitioner's position. Story wrote that because the President's "incidental powers" must include "the power to perform [his duties], without any obstruction," he "cannot, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office; and *for this purpose* his person must be deemed, in civil cases at least, to possess an official inviolability." 3 Story § 1563, at 418–419 (emphasis added). Story said only that "*an* official inviolability," *ibid.* (emphasis added), was necessary to preserve the President's ability to perform the functions of the office; he did not specify the dimensions of the necessary immunity. While we have held that an immunity from suits grounded on official acts is necessary to serve this purpose, see *Fitzgerald,* 457 U. S., at 749, it does not follow that the broad immunity from *all* civil damages suits that petitioner seeks is also necessary.

"Just what our forefathers did envision, or would have envisioned had they foreseen modern conditions, must be divined from materials almost as enigmatic as the dreams Joseph was called upon to interpret for Pharoah. A century and a half of partisan debate and scholarly speculation yields no net result but only supplies more or less apt quotations from respected sources on each side . . . . They largely cancel each other." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 634–635 (1952) (concurring opinion).

## VI

Petitioner's strongest argument supporting his immunity claim is based on the text and structure of the Constitution. He does not contend that the occupant of the Office of the President is "above the law," in the sense that his conduct is entirely immune from judicial scrutiny.[24] The President argues merely for a postponement of the judicial proceedings that will determine whether he violated any law. His argument is grounded in the character of the office that was created by Article II of the Constitution, and relies on separation-of-powers principles that have structured our constitutional arrangement since the founding.

As a starting premise, petitioner contends that he occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties. He submits that—given the nature of the office—the doctrine of separation of powers places limits on the authority of the

---

[24] For that reason, the argument does not place any reliance on the English ancestry that informs our common-law jurisprudence; he does not claim the prerogatives of the monarchs who asserted that "[t]he King can do no wrong." See 1 W. Blackstone, Commentaries *246. Although we have adopted the related doctrine of sovereign immunity, the common-law fiction that "[t]he king . . . is not only incapable of *doing* wrong, but even of *thinking* wrong," *ibid.*, was rejected at the birth of the Republic. See, *e. g., Nevada* v. *Hall*, 440 U. S. 410, 415, and nn. 7–8 (1979); *Langford* v. *United States*, 101 U. S. 341, 342–343 (1880).

Federal Judiciary to interfere with the Executive Branch that would be transgressed by allowing this action to proceed.

We have no dispute with the initial premise of the argument. Former Presidents, from George Washington to George Bush, have consistently endorsed petitioner's characterization of the office.[25]  After serving his term, Lyndon Johnson observed: "Of all the 1,886 nights I was President, there were not many when I got to sleep before 1 or 2 a.m., and there were few mornings when I didn't wake up by 6 or 6:30."[26]  In 1967, the Twenty-fifth Amendment to the Constitution was adopted to ensure continuity in the performance of the powers and duties of the office;[27] one of the sponsors of that Amendment stressed the importance of providing that "at all times" there be a President "who has complete control and will be able to perform" those duties.[28]  As Justice Jackson has pointed out, the Presidency concentrates executive authority "in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations.  In drama, magnitude and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear."  *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S., at 653 (concurring opinion).  We have, in short, long recognized the "unique position in the constitutional scheme" that this office occupies.  *Fitzgerald,*

---

[25] See, *e. g.,* A. Tourtellot, The Presidents on the Presidency 346–374 (1964) (citing comments of, among others, George Washington, John Quincy Adams, Benjamin Harrison, Theodore Roosevelt, William Howard Taft, and Woodrow Wilson); H. Finer, The Presidency: Crisis and Regeneration 35–37 (1960) (citing similar remarks by a number of Presidents, including James Monroe, James K. Polk, and Harry Truman).

[26] L. Johnson, The Vantage Point 425 (1971).

[27] The Amendment sets forth, *inter alia,* an elaborate procedure for Presidential succession in the event that the Chief Executive becomes incapacitated.  See U. S. Const., Amdt. 25, §§ 3–4.

[28] 111 Cong. Rec. 15595 (1965) (remarks of Sen. Bayh).

457 U. S., at 749.[29]   Thus, while we suspect that even in our modern era there remains some truth to Chief Justice Marshall's suggestion that the duties of the Presidency are not entirely "unremitting," *United States* v. *Burr*, 25 F. Cas. 30, 34 (No. 14,692d) (CC Va. 1807), we accept the initial premise of the Executive's argument.

It does not follow, however, that separation-of-powers principles would be violated by allowing this action to proceed.   The doctrine of separation of powers is concerned with the allocation of official power among the three coequal branches of our Government.   The Framers "built into the tripartite Federal Government . . . a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other."   *Buckley* v. *Valeo*, 424 U. S., at 122.[30]   Thus, for example, the Congress may not exercise the judicial power to revise final judgments, *Plaut* v. *Spendthrift*

---

[29] We noted in *Fitzgerald:* "Article II, § 1, of the Constitution provides that '[t]he executive Power shall be vested in a President of the United States . . . .'   This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity.   These include the enforcement of federal law—it is the President who is charged constitutionally to 'take Care that the Laws be faithfully executed'; the conduct of foreign affairs—a realm in which the Court has recognized that '[i]t would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret'; and management of the Executive Branch— a task for which 'imperative reasons requir[e] an unrestricted power [in the President] to remove the most important of his subordinates in their most important duties.'"   457 U. S., at 749–750 (footnotes omitted).

[30] See *Loving* v. *United States*, 517 U. S. 748, 756–757 (1996); *Mistretta* v. *United States*, 488 U. S. 361, 382 (1989) ("[C]oncern of encroachment and aggrandizement . . . has animated our separation-of-powers jurisprudence"); The Federalist No. 51, p. 349 (J. Cooke ed. 1961) ("[T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means, and personal motives, to resist encroachments of the others").

*Farm, Inc.*, 514 U. S. 211 (1995),[31] or the executive power to manage an airport, see *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252, 276 (1991) (holding that "[i]f the power is executive, the Constitution does not permit an agent of Congress to exercise it").[32] See *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 406 (1928) (Congress may not "invest itself or its members with either executive power or judicial power"). Similarly, the President may not exercise the legislative power to authorize the seizure of private property for public use. *Youngstown*, 343 U. S., at 588. And, the judicial power to decide cases and controversies does not include the provision of purely advisory opinions to the Executive,[33] or permit the federal courts to resolve nonjusticiable questions.[34]

---

[31] See also *United States* v. *Klein*, 13 Wall. 128, 147 (1872) (noting that Congress had "inadvertently passed the limit which separates the legislative from the judicial power").

[32] See also *Bowsher* v. *Synar*, 478 U. S. 714, 726 (1986) ("structure of the Constitution does not permit Congress to execute the laws"). Cf. *INS* v. *Chadha*, 462 U. S. 919, 958 (1983); *Springer* v. *Philippine Islands*, 277 U. S. 189, 202–203 (1928).

[33] See *United States* v. *Ferreira*, 13 How. 40 (1852); *Hayburn's Case*, 2 Dall. 409 (1792). As we explained in *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 113 (1948): "This Court early and wisely determined that it would not give advisory opinions even when asked by the Chief Executive." More generally, "we have broadly stated that 'executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution.'" *Morrison* v. *Olson*, 487 U. S. 654, 677 (1988) (quoting *Buckley* v. *Valeo*, 424 U. S. 1, 123 (1976) *(per curiam)*). These restrictions on judicial activities "help ensure the independence of the Judicial Branch and to prevent the Judiciary from encroaching into areas reserved for the other branches." 487 U. S., at 678; see also *Mistretta* v. *United States*, 488 U. S., at 385.

[34] We have long held that the federal courts may not resolve such matters. See, *e. g., Luther* v. *Borden*, 7 How. 1 (1849). As we explained in *Nixon* v. *United States*, 506 U. S. 224 (1993): "A controversy is nonjusticiable—*i. e.*, involves a political question—where there is a 'textually demon-

Of course the lines between the powers of the three branches are not always neatly defined. See *Mistretta* v. *United States*, 488 U. S. 361, 380–381 (1989).[35] But in this case there is no suggestion that the Federal Judiciary is being asked to perform any function that might in some way be described as "executive." Respondent is merely asking the courts to exercise their core Article III jurisdiction to decide cases and controversies. Whatever the outcome of this case, there is no possibility that the decision will curtail the scope of the official powers of the Executive Branch. The litigation of questions that relate entirely to the unofficial conduct of the individual who happens to be the President poses no perceptible risk of misallocation of either judicial power or executive power.

Rather than arguing that the decision of the case will produce either an aggrandizement of judicial power or a narrowing of executive power, petitioner contends that—as a byproduct of an otherwise traditional exercise of judicial power—burdens will be placed on the President that will hamper the performance of his official duties. We have recognized that "[e]ven when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving* v. *United States*, 517 U. S. 748, 757 (1996); see also *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 443 (1977). As a factual matter, petitioner contends that this particular case—as well as the potential

---

strable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it . . . .' *Baker* v. *Carr*, 369 U. S. 186, 217 (1962). But the courts must, in the first instance, interpret the text in question and determine whether and to what extent the issue is textually committed. See *ibid.; Powell* v. *McCormack*, 395 U. S. 486, 519 (1969)." *Id.*, at 228.

[35] See also *Olson*, 487 U. S., at 693–694; *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 443 (1977); *United States* v. *Nixon*, 418 U. S. 683, 707 (1974); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (Jackson, J., concurring).

additional litigation that an affirmance of the Court of Appeals judgment might spawn—may impose an unacceptable burden on the President's time and energy, and thereby impair the effective performance of his office.

Petitioner's predictive judgment finds little support in either history or the relatively narrow compass of the issues raised in this particular case. As we have already noted, in the more than 200-year history of the Republic, only three sitting Presidents have been subjected to suits for their private actions.[36] See *supra*, at 692. If the past is any indicator, it seems unlikely that a deluge of such litigation will ever engulf the Presidency. As for the case at hand, if properly managed by the District Court, it appears to us highly unlikely to occupy any substantial amount of petitioner's time.

Of greater significance, petitioner errs by presuming that interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions. "[O]ur . . . system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which 'would preclude the establishment of a Nation capable of governing itself effectively.'" *Mistretta*, 488 U. S., at 381 (quoting *Buck-*

---

[36] In *Fitzgerald*, we were able to discount the lack of historical support for the proposition that official-capacity actions against the President posed a serious threat to the office on the ground that a right to sue federal officials for damages as a result of constitutional violations had only recently been recognized. See 457 U. S., at 753, n. 33; *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971). The situation with respect to suits against the President for actions taken in his private capacity is quite different because such suits may be grounded on legal theories that have always been applicable to any potential defendant. Moreover, because the President has contact with far fewer people in his private life than in his official capacity, the class of potential plaintiffs is considerably smaller and the risk of litigation less intense.

*ley*, 424 U. S., at 121). As Madison explained, separation of powers does not mean that the branches "ought to have no *partial agency* in, or no *controul* over the acts of each other." [37] The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution. Two long-settled propositions, first announced by Chief Justice Marshall, support that conclusion.

First, we have long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law. Perhaps the most dramatic example of such a case is our holding that President Truman exceeded his constitutional authority when he issued an order directing the Secretary of Commerce to take possession of and operate most of the Nation's steel mills in order to avert a national catastrophe. *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579 (1952). Despite the serious impact of that decision on the ability of the Executive Branch to accomplish its assigned mission, and the substantial time that the President must necessarily have devoted to the matter as a result of judicial involvement, we exercised our Article III jurisdiction to decide whether his official conduct conformed to the law. Our holding was an application of the principle established in *Marbury* v. *Madison*, 1 Cranch 137 (1803), that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Id.*, at 177.

Second, it is also settled that the President is subject to judicial process in appropriate circumstances. Although Thomas Jefferson apparently thought otherwise, Chief Justice Marshall, when presiding in the treason trial of Aaron Burr, ruled that a subpoena *duces tecum* could be directed

---

[37] The Federalist No. 47, pp. 325–326 (J. Cooke ed. 1961) (emphasis in original). See *Mistretta*, 488 U. S., at 381; *Nixon* v. *Administrator of General Services*, 433 U. S., at 442, n. 5.

704

to the President. *United States* v. *Burr,* 25 F. Cas. 30 (No. 14,692d) (CC Va. 1807).[38] We unequivocally and emphatically endorsed Marshall's position when we held that President Nixon was obligated to comply with a subpoena commanding him to produce certain tape recordings of his conversations with his aides. *United States* v. *Nixon,* 418 U. S. 683 (1974). As we explained, "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." *Id.,* at 706.[39]

Sitting Presidents have responded to court orders to provide testimony and other information with sufficient frequency that such interactions between the Judicial and Executive Branches can scarcely be thought a novelty. President Monroe responded to written interrogatories, see Rotunda, Presidents and Ex-Presidents as Witnesses: A Brief Historical Footnote, 1975 U. Ill. L. Forum 1, 5–6, President Nixon—as noted above—produced tapes in response to a subpoena

---

[38] After the decision was rendered, Jefferson expressed his distress in a letter to a prosecutor at the trial, noting that "[t]he Constitution enjoins [the President's] constant agency in the concerns of 6. millions of people." 10 Works of Thomas Jefferson 404, n. (P. Ford ed. 1905). He asked: "Is the law paramount to this, which calls on him on behalf of a single one?" *Ibid.;* see also *Fitzgerald,* 457 U. S., at 751–752, n. 31 (quoting Jefferson's comments at length). For Chief Justice Marshall, the answer—quite plainly—was yes.

[39] Of course, it does not follow that a court may "'proceed against the president as against an ordinary individual,'" *United States* v. *Nixon,* 418 U. S., at 715 (quoting *United States* v. *Burr,* 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807)). Special caution is appropriate if the materials or testimony sought by the court relate to a President's official activities, with respect to which "[t]he interest in preserving confidentiality is weighty indeed and entitled to great respect." 418 U. S., at 712. We have made clear that in a criminal case the powerful interest in the "fair administration of criminal justice" requires that the evidence be given under appropriate circumstances lest the "very integrity of the judicial system" be eroded. *Id.,* at 709, 711–712.

*duces tecum,* see *United States* v. *Nixon,* President Ford complied with an order to give a deposition in a criminal trial, *United States* v. *Fromme,* 405 F. Supp. 578 (ED Cal. 1975), and President Clinton has twice given videotaped testimony in criminal proceedings, see *United States* v. *Mc-Dougal,* 934 F. Supp. 296 (ED Ark. 1996); *United States* v. *Branscum,* No. LRP–CR–96–49 (ED Ark., June 7, 1996). Moreover, sitting Presidents have also voluntarily complied with judicial requests for testimony. President Grant gave a lengthy deposition in a criminal case under such circumstances, 1 R. Rotunda & J. Nowak, Treatise on Constitutional Law § 7.1 (2d ed. 1992), and President Carter similarly gave videotaped testimony for use at a criminal trial, *id.,* § 7.1(b) (Supp. 1997).

In sum, "[i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Fitzgerald,* 457 U. S., at 753–754. If the Judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct, and if it may direct appropriate process to the President himself, it must follow that the federal courts have power to determine the legality of his unofficial conduct. The burden on the President's time and energy that is a mere byproduct of such review surely cannot be considered as onerous as the direct burden imposed by judicial review and the occasional invalidation of his official actions.[40] We therefore hold that the doctrine of separation of powers does not

---

[40] There is, no doubt, some truth to Learned Hand's comment that a lawsuit should be "dread[ed] . . . beyond almost anything else short of sickness and death." 3 Association of the Bar of the City of New York, Lectures on Legal Topics 105 (1926). We recognize that a President, like any other official or private citizen, may become distracted or preoccupied by pending litigation. Presidents and other officials face a variety of demands on their time, however, some private, some political, and some as a result of official duty. While such distractions may be vexing to those subjected to them, they do not ordinarily implicate constitutional separation-of-powers concerns.

require federal courts to stay all private actions against the President until he leaves office.

The reasons for rejecting such a categorical rule apply as well to a rule that would require a stay "in all but the most exceptional cases." Brief for Petitioner i. Indeed, if the Framers of the Constitution had thought it necessary to protect the President from the burdens of private litigation, we think it far more likely that they would have adopted a categorical rule than a rule that required the President to litigate the question whether a specific case belonged in the "exceptional case" subcategory. In all events, the question whether a specific case should receive exceptional treatment is more appropriately the subject of the exercise of judicial discretion than an interpretation of the Constitution. Accordingly, we turn to the question whether the District Court's decision to stay the trial until after petitioner leaves office was an abuse of discretion.

## VII

The Court of Appeals described the District Court's discretionary decision to stay the trial as the "functional equivalent" of a grant of temporary immunity. 72 F. 3d, at 1361, n. 9. Concluding that petitioner was not constitutionally entitled to such an immunity, the court held that it was error to grant the stay. *Ibid.* Although we ultimately conclude that the stay should not have been granted, we think the issue is more difficult than the opinion of the Court of Appeals suggests.

Strictly speaking the stay was not the functional equivalent of the constitutional immunity that petitioner claimed, because the District Court ordered discovery to proceed. Moreover, a stay of either the trial or discovery might be justified by considerations that do not require the recognition of any constitutional immunity. The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket. See, *e. g., Landis* v. *North*

*American Co.*, 299 U. S. 248, 254 (1936). As we have explained, "[e]specially in cases of extraordinary public moment, [a plaintiff] may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted." *Id.*, at 256. Although we have rejected the argument that the potential burdens on the President violate separation-of-powers principles, those burdens are appropriate matters for the District Court to evaluate in its management of the case. The high respect that is owed to the office of the Chief Executive, though not justifying a rule of categorical immunity, is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery.[41]

Nevertheless, we are persuaded that it was an abuse of discretion for the District Court to defer the trial until after the President leaves office. Such a lengthy and categorical stay takes no account whatever of the respondent's interest in bringing the case to trial. The complaint was filed within the statutory limitations period—albeit near the end of that period—and delaying trial would increase the danger of

---

[41] Although these claims are in fact analytically distinct, the District Court does not appear to have drawn that distinction. Rather than basing its decision on particular factual findings that might have buttressed an exercise of discretion, the District Court instead suggested that a discretionary stay was supported by the *legal conclusion* that such a stay was required by *Fitzgerald*. See 869 F. Supp., at 699. We therefore reject petitioner's argument that we lack jurisdiction over respondent's cross-appeal from the District Court's alternative holding that its decision was "also permitted," *inter alia*, "under the equity powers of the Court." *Ibid.* The Court of Appeals correctly found that pendent appellate jurisdiction over this issue was proper. See 72 F. 3d, at 1357, n. 4. The District Court's legal ruling that the President was protected by a temporary immunity from trial—but not discovery—was "inextricably intertwined," *Swint* v. *Chambers County Comm'n*, 514 U. S. 35, 51 (1995), with its suggestion that a discretionary stay having the same effect might be proper; indeed, "review of the [latter] decision [is] necessary to ensure meaningful review of the [former]," *ibid.*

prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party.

The decision to postpone the trial was, furthermore, premature. The proponent of a stay bears the burden of establishing its need. *Id.*, at 255. In this case, at the stage at which the District Court made its ruling, there was no way to assess whether a stay of trial after the completion of discovery would be warranted. Other than the fact that a trial may consume some of the President's time and attention, there is nothing in the record to enable a judge to assess the potential harm that may ensue from scheduling the trial promptly after discovery is concluded. We think the District Court may have given undue weight to the concern that a trial might generate unrelated civil actions that could conceivably hamper the President in conducting the duties of his office. If and when that should occur, the court's discretion would permit it to manage those actions in such fashion (including deferral of trial) that interference with the President's duties would not occur. But no such impingement upon the President's conduct of his office was shown here.

## VIII

We add a final comment on two matters that are discussed at length in the briefs: the risk that our decision will generate a large volume of politically motivated harassing and frivolous litigation, and the danger that national security concerns might prevent the President from explaining a legitimate need for a continuance.

We are not persuaded that either of these risks is serious. Most frivolous and vexatious litigation is terminated at the pleading stage or on summary judgment, with little if any personal involvement by the defendant. See Fed. Rules Civ. Proc. 12, 56. Moreover, the availability of sanctions provides a significant deterrent to litigation directed at the President in his unofficial capacity for purposes of political

gain or harassment.[42] History indicates that the likelihood that a significant number of such cases will be filed is remote. Although scheduling problems may arise, there is no reason to assume that the district courts will be either unable to accommodate the President's needs or unfaithful to the tradition—especially in matters involving national security—of giving "the utmost deference to Presidential responsibilities."[43] Several Presidents, including petitioner, have given testimony without jeopardizing the Nation's security. See *supra*, at 704–705. In short, we have confidence in the ability of our federal judges to deal with both of these concerns.

If Congress deems it appropriate to afford the President stronger protection, it may respond with appropriate legislation. As petitioner notes in his brief, Congress has enacted more than one statute providing for the deferral of civil litigation to accommodate important public interests. Brief for Petitioner 34–36. See, *e. g.*, 11 U. S. C. § 362 (litigation against debtor stayed upon filing of bankruptcy petition); Soldiers' and Sailors' Civil Relief Act of 1940, 50 U. S. C. App. §§ 501–525 (provisions governing, *inter alia*, tolling or stay of civil claims by or against military personnel during course of active duty). If the Constitution embodied the rule that

---

[42] See, *e. g.*, Fed. Rule Civ. Proc. 11; 28 U. S. C. § 1927; *Chambers* v. *NASCO, Inc.*, 501 U. S. 32, 50 (1991) (noting that "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power" in imposing appropriate sanctions). Those sanctions may be set at a level "sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed. Rule Civ. Proc. 11(c)(2). As Rule 11 indicates, sanctions may be appropriate where a claim is "presented for any improper purpose, such as to harass," including any claim based on "allegations and other factual contentions [lacking] evidentiary support" or unlikely to prove well-grounded after reasonable investigation. Rules 11(b)(1), (3).

[43] *United States* v. *Nixon*, 418 U. S., at 710–711; see also *Fitzgerald*, 457 U. S., at 753 ("Courts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint").

the President advocates, Congress, of course, could not repeal it. But our holding today raises no barrier to a statutory response to these concerns.

The Federal District Court has jurisdiction to decide this case. Like every other citizen who properly invokes that jurisdiction, respondent has a right to an orderly disposition of her claims. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE BREYER, concurring in the judgment.

I agree with the majority that the Constitution does not automatically grant the President an immunity from civil lawsuits based upon his private conduct. Nor does the "doctrine of separation of powers . . . require federal courts to stay" virtually "all private actions against the President until he leaves office." *Ante,* at 705–706. Rather, as the Court of Appeals stated, the President cannot simply rest upon the claim that a private civil lawsuit for damages will "interfere with the constitutionally assigned duties of the Executive Branch . . . without detailing any specific responsibilities or explaining how or the degree to which they are affected by the suit." 72 F. 3d 1354, 1361 (CA8 1996). To obtain a postponement the President must "bea[r] the burden of establishing its need." *Ante,* at 708.

In my view, however, once the President sets forth and explains a conflict between judicial proceeding and public duties, the matter changes. At that point, the Constitution permits a judge to schedule a trial in an ordinary civil damages action (where postponement normally is possible without overwhelming damage to a plaintiff) only within the constraints of a constitutional principle—a principle that forbids a federal judge in such a case to interfere with the President's discharge of his public duties. I have no doubt that the Constitution contains such a principle applicable to civil suits, based upon Article II's vesting of the entire "executive Power" in a single individual, implemented through the Con-

stitution's structural separation of powers, and revealed both by history and case precedent.

I recognize that this case does not require us now to apply the principle specifically, thereby delineating its contours; nor need we now decide whether lower courts are to apply it directly or categorically through the use of presumptions or rules of administration. Yet I fear that to disregard it now may appear to deny it. I also fear that the majority's description of the relevant precedents de-emphasizes the extent to which they support a principle of the President's independent authority to control his own time and energy, see, *e. g., ante,* at 693, 694 (describing the "central concern" of *Nixon* v. *Fitzgerald,* 457 U. S. 731 (1982), as "to avoid rendering the President 'unduly cautious'"); *ante,* at 695, 696, and n. 23 (describing statements by Story, Jefferson, Adams, and Ellsworth as providing "little" or "no substantial support" for the President's position). Further, if the majority is wrong in predicting the future infrequency of private civil litigation against sitting Presidents, *ante,* at 702, acknowledgment and future delineation of the constitutional principle will prove a practically necessary institutional safeguard. For these reasons, I think it important to explain how the Constitution's text, history, and precedent support this principle of judicial noninterference with Presidential functions in ordinary civil damages actions.

I

The Constitution states that the "executive Power shall be vested in a President." Art. II, § 1. This constitutional delegation means that a sitting President is unusually busy, that his activities have an unusually important impact upon the lives of others, and that his conduct embodies an authority bestowed by the entire American electorate. He (along with his constitutionally subordinate Vice President) is the only official for whom the entire Nation votes, and is the only elected officer to represent the entire Nation both domestically and abroad.

712

This constitutional delegation means still more. Article II makes a single President responsible for the actions of the Executive Branch in much the same way that the entire Congress is responsible for the actions of the Legislative Branch, or the entire Judiciary for those of the Judicial Branch. It thereby creates a constitutional equivalence between a single President, on the one hand, and many legislators, or judges, on the other.

The Founders created this equivalence by consciously deciding to vest Executive authority in one person rather than several. They did so in order to focus, rather than to spread, Executive responsibility thereby facilitating accountability. They also sought to encourage energetic, vigorous, decisive, and speedy execution of the laws by placing in the hands of a single, constitutionally indispensable, individual the ultimate authority that, in respect to the other branches, the Constitution divides among many. Compare U. S. Const., Art. II, § 1 (vesting power in "a President"), with U. S. Const., Art. I, § 1 (vesting power in "a Congress" that "consist[s] of a Senate and House of Representatives"), and U. S. Const., Art. III, § 1 (vesting power in a "supreme Court" and "inferior Courts").

The authority explaining the nature and importance of this decision is legion. See, e. g., J. Locke, Second Treatise of Civil Government § 144 (J. Gough ed. 1947) (desirability of a perpetual Executive); 1 W. Blackstone, Commentaries *242–*243 (need for single Executive); The Federalist No. 70, p. 423 (C. Rossiter ed. 1961) (A. Hamilton) (Executive "[e]nergy" needed for security, "steady administration of the laws," "protection of property," "justice," and protection of "liberty"); Ellsworth, The Landholder, VI, in Essays on the Constitution 161, 163 (P. Ford ed. 1892) ("supreme executive should be one person, and unfettered otherwise than by the laws he is to execute"); Morrison v. Olson, 487 U. S. 654, 698–699 (1988) (SCALIA, J., dissenting) (describing history); id., at 705 (describing textual basis); id., at 729 (describing

policy arguments). See also The Federalist No. 71, at 431 (A. Hamilton); P. Kurland, Watergate and the Constitution 135 (1978) (President is "sole indispensable man in government" and "should not be called" from his duties "at the instance of any other . . . branch of government"); Calabresi, Some Normative Arguments for the Unitary Executive, 48 Ark. L. Rev. 23, 37–47 (1995). Cf. T. Roosevelt, An Autobiography 372 (1913).

For present purposes, this constitutional structure means that the President is not like Congress, for Congress can function as if it were whole, even when up to half of its members are absent, see U. S. Const., Art. I, § 5, cl. 1. It means that the President is not like the Judiciary, for judges often can designate other judges, e. g., from other judicial circuits, to sit even should an entire court be detained by personal litigation. It means that, unlike Congress, which is regularly out of session, U. S. Const., Art. I, §§ 4, 5, 7, the President never adjourns.

More importantly, these constitutional objectives explain why a President, though able to delegate duties to others, cannot delegate ultimate responsibility or the active obligation to supervise that goes with it. And the related constitutional equivalence between President, Congress, and the Judiciary means that judicial scheduling orders in a private civil case must not only take reasonable account of, say, a particularly busy schedule, or a job on which others critically depend, or an underlying electoral mandate. They must also reflect the fact that interference with a President's ability to carry out his public responsibilities is constitutionally equivalent to interference with the ability of the entirety of Congress, or the Judicial Branch, to carry out its public obligations.

## II

The leading case regarding Presidential immunity from suit is *Nixon* v. *Fitzgerald.* Before discussing *Fitzgerald,* it is helpful to understand the historical precedent on which it

relies. While later events have called into question some of the more extreme views on Presidential immunity, the essence of the constitutional principle remains true today. The historical sources, while not in themselves fully determinative, in conjunction with this Court's precedent inform my judgment that the Constitution protects the President from judicial orders in private civil cases to the extent that those orders could significantly interfere with his efforts to carry out his ongoing public responsibilities.

## A

Three of the historical sources this Court cited in *Fitzgerald*, 457 U. S., at 749, 750–752, n. 31—a commentary by Joseph Story, an argument attributed to John Adams and Oliver Ellsworth, and a letter written by Thomas Jefferson— each make clear that this is so.

First, Joseph Story wrote in his Commentaries:

> "There are . . . incidental powers, belonging to the executive department, which are necessarily implied from the nature of the functions, which are confided to it. Among those, must necessarily be included the power to perform them, without any obstruction or impediment whatsoever. The president cannot, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office; *and for this purpose his person must be deemed, in civil cases at least, to possess an official inviolability.*" 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418–419 (1833) (emphasis added), quoted in *Fitzgerald, supra,* at 749.

As interpreted by this Court in *Nixon* v. *Fitzgerald,* the words "for this purpose" would seem to refer to the President's need for "official inviolability" in order to "perform" the duties of his office without "obstruction or impediment." As so read, Story's commentary does not explicitly define the

contours of "official inviolability." But it does suggest that the "inviolability" is timebound ("while . . . in the discharge of the duties of his office"); that it applies in private lawsuits (for it attaches to the President's "person" in "civil cases"); and that it is functional ("necessarily implied from the nature of the [President's] functions").

Since *Fitzgerald* did not involve a physical constraint, the Court's reliance upon Justice Story's commentary makes clear, in the Court's view, that the commentary does not limit the scope of "inviolability" to an immunity from a physical imprisonment, physical detention, or physical "arrest"—a now abandoned procedure that permitted the arrest of certain civil case defendants (*e. g.*, those threatened by bankruptcy) during a civil proceeding.

I would therefore read Story's commentary to mean what it says, namely, that Article II implicitly grants an "official inviolability" to the President "while he is in the discharge of the duties of his office," and that this inviolability must be broad enough to permit him "to perform" his official duties without "obstruction or impediment." As this Court has previously held, the Constitution may grant this kind of protection implicitly; it need not do so explicitly. See *Fitzgerald, supra,* at 750, n. 31; *United States* v. *Nixon,* 418 U. S. 683, 705–706, n. 16 (1974); cf. *McCulloch* v. *Maryland,* 4 Wheat. 316, 406 (1819).

Second, during the first Congress, then-Vice President John Adams and then-Senator Oliver Ellsworth expressed a view of an applicable immunity far broader than any currently asserted. Speaking of a sitting President, they said that the " 'President, personally, was not the subject to any process whatever . . . . For [that] would . . . put it in the power of a common justice to exercise any authority over him and stop the whole machine of Government.' " 457 U. S., at 751, n. 31 (quoting Journal of William Maclay 167 (E. Maclay ed. 1890) (Sept. 26 journal entry reporting exchange between Sen. Maclay, Adams, and Ellsworth)). They

716

included in their claim a kind of immunity from criminal, as well as civil, process. They responded to a counterargument—that the President "was not above the laws," and would have to be arrested if guilty of crimes—by stating that the President would first have to be impeached, and could then be prosecuted. 9 Documentary History of First Federal Congress of United States 168 (K. Bowling & H. Veit eds. 1988) (Diary of William Maclay). This Court's rejection of Adams' and Ellsworth's views in the context of criminal proceedings, see *ante*, at 703–704, does not deprive those views of authority here. See *Fitzgerald, supra*, at 751–752, n. 31. Nor does the fact that Senator William Maclay, who reported the views of Adams and Ellsworth, "went on to point out in his diary that he virulently disagreed with them." *Ante*, at 696, n. 23. Maclay, unlike Adams and Ellsworth, was not an important political figure at the time of the constitutional debates. See Diary of William Maclay xi–xiii.

Third, in 1807, a sitting President, Thomas Jefferson, during a dispute about whether the federal courts could subpoena his presence in a criminal case, wrote the following to United States Attorney George Hay:

> "The leading principle of our Constitution is the independence of the Legislature, executive and judiciary of each other, and none are more jealous of this than the judiciary. But would the executive be independent of the judiciary, if he were subject to the *commands* of the latter, & to imprisonment for disobedience; if the several courts could bandy him from pillar to post, keep him constantly trudging from north to south & east to west, and withdraw him entirely from his constitutional duties?" 10 Works of Thomas Jefferson 404, n. (P. Ford ed. 1905) (letter of June 20, 1807, from President Thomas Jefferson to United States Attorney George Hay), quoted in *Fitzgerald, supra*, at 751, n. 31.

Three days earlier Jefferson had written to the same correspondent:

> "To comply with such calls would leave the nation without an executive branch, whose agency, nevertheless, is understood to be so constantly necessary, that it is the sole branch which the constitution requires to be always in function. It could not then mean that it should be withdrawn from its station by any co-ordinate authority." 10 Works of Thomas Jefferson, at 401 (letter of June 17, 1807, from Thomas Jefferson to George Hay).

Jefferson, like Adams and Ellsworth, argued strongly for an immunity from both criminal and civil judicial process—an immunity greater in scope than any immunity, or any special scheduling factor, now at issue in the civil case before us. The significance of his views for present purposes lies in his conviction that the Constitution protected a sitting President from litigation that would "withdraw" a President from his current "constitutional duties." That concern may not have applied to Mr. Fitzgerald's 1982 case against a *former* President, but it is at issue in the current litigation.

Precedent that suggests to the contrary—that the Constitution does *not* offer a sitting President significant protections from potentially distracting civil litigation—consists of the following: (1) In several instances sitting Presidents have given depositions or testified at criminal trials, and (2) this Court has twice authorized the enforcement of subpoenas seeking documents from a sitting President for use in a criminal case.

I agree with the majority that these precedents reject any absolute Presidential immunity from all court process. But they do not cast doubt upon Justice Story's basic conclusion that "in civil cases," a sitting President "possess[es] an official inviolability" as necessary to permit him to "perform" the duties of his office without "obstruction or impediment."

718

The first set of precedents tells us little about what the Constitution commands, for they amount to voluntary actions on the part of a sitting President. The second set of precedents amounts to a search for documents, rather than a direct call upon Presidential time. More important, both sets of precedents involve *criminal* proceedings in which the President participated as a witness. Criminal proceedings, unlike private civil proceedings, are public acts initiated and controlled by the Executive Branch; see *United States* v. *Nixon,* 418 U. S., at 693–696; they are not normally subject to postponement, see U. S. Const., Amdt. 6; and ordinarily they put at risk, not a private citizen's hope for monetary compensation, but a private citizen's freedom from enforced confinement, 418 U. S., at 711–712, and n. 19; *Fitzgerald,* 457 U. S., at 754, n. 37. See also *id.,* at 758, n. 41. Nor is it normally possible in a criminal case, unlike many civil cases, to provide the plaintiff with interest to compensate for scheduling delay. See, *e. g., Winter* v. *Cerro Gordo County Conservation Bd.,* 925 F. 2d 1069, 1073 (CA8 1991); *Foley* v. *Lowell,* 948 F. 2d 10, 17–18 (CA1 1991); *Wooten* v. *McClendon,* 272 Ark. 61, 62–63, 612 S. W. 2d 105, 106 (1981).

The remaining precedent to which the majority refers does not seem relevant in this case. That precedent, *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 585 (1952), concerns *official* action. And any Presidential time spent dealing with, or action taken in response to, that kind of case *is* part of a President's official duties. Hence court review in such circumstances could not interfere with, or distract from, official duties. Insofar as a court orders a President, in any such a proceeding, to act or to refrain from action, it defines, or determines, or clarifies the legal scope of an official duty. By definition (if the order itself is lawful), it cannot impede, or obstruct, or interfere with the President's basic task— the lawful exercise of his Executive authority. Indeed, if constitutional principles counsel caution when judges consider an order that directly requires the President properly

to carry out his official duties, see *Franklin* v. *Massachusetts*, 505 U. S. 788, 827 (1992) (SCALIA, J., concurring in part and concurring in judgment) (describing the "apparently unbroken historical tradition . . . implicit in the separation of powers" that a President may not be ordered by the Judiciary to perform particular Executive acts); *id.*, at 802–803 (plurality opinion of O'CONNOR, J.), so much the more must those principles counsel caution when such an order threatens to *interfere* with the President's properly carrying out those duties.

B

Case law, particularly, *Nixon* v. *Fitzgerald*, strongly supports the principle that judges hearing a private civil damages action against a sitting President may not issue orders that could significantly distract a President from his official duties. In *Fitzgerald*, the Court held that former President Nixon was absolutely immune from civil damages lawsuits based upon any conduct within the "outer perimeter" of his official responsibilities. 457 U. S., at 756. The holding rested upon six determinations that are relevant here.

First, the Court found that the Constitution assigns the President *singularly* important duties (thus warranting an "absolute," rather than a "qualified," immunity). *Id.*, at 750–751. Second, the Court held that "recognition of immunity" does not require a "specific textual basis" in the Constitution. *Id.*, at 750, n. 31. Third, although physical constraint of the President was not at issue, the Court nevertheless considered Justice Story's constitutional analysis, discussed *supra*, at 714–715, "persuasive." 457 U. S., at 749. Fourth, the Court distinguished contrary precedent on the ground that it involved criminal, not civil, proceedings. *Id.*, at 754, and n. 37. Fifth, the Court's concerns encompassed the fact that "the sheer prominence of the President's office" could make him "an easily identifiable target for suits for civil damages." *Id.*, at 752–753. Sixth, and most important, the Court rested its conclusion in important part upon

the fact that civil lawsuits "could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.*, at 753.

The majority argues that this critical, last-mentioned, feature of the case is dicta. *Ante*, at 694, n. 19. In the majority's view, since the defendant was a *former* President, the lawsuit could not have *distracted* him from his official duties; hence the case must rest entirely upon an alternative concern, namely, that a President's fear of civil lawsuits based upon his official duties could *distort* his official decision-making. The majority, however, overlooks the fact that *Fitzgerald* set forth a single immunity (an absolute immunity) applicable *both* to sitting *and* former Presidents. Its reasoning focused upon both. Its key paragraph, explaining why the President enjoys an absolute immunity rather than a qualified immunity, contains seven sentences, four of which focus primarily upon time and energy *distraction* and three of which focus primarily upon official decision *distortion.* Indeed, that key paragraph begins by stating:

> "Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." 457 U. S., at 751.

Moreover, the Court, in numerous other cases, has found the problem of time and energy distraction a critically important consideration militating in favor of a grant of immunity. See, *e. g., Harlow* v. *Fitzgerald*, 457 U. S. 800, 817–818 (1982) (qualified immunity for Presidential assistants based in part on "costs of trial" and "burdens of broad-reaching discovery" that are "peculiarly disruptive of effective government"); *Imbler* v. *Pachtman*, 424 U. S. 409, 423 (1976) (absolute immunity of prosecutors based in part upon concern about "deflection of the prosecutor's energies from his public duties"); *Tenney* v. *Brandhove*, 341 U. S. 367, 377 (1951) (absolute im-

munity for legislators avoids danger they will "be subjected to the cost and inconvenience and distractions of a trial"). Indeed, cases that provide public officials, not with immunity, but with special protective procedures such as interlocutory appeals, rest *entirely* upon a "time and energy distraction" rationale. See *Behrens* v. *Pelletier*, 516 U. S. 299, 306, 308 (1996) ("[G]overnment official['s] right . . . to avoid standing trial [and] to avoid the burdens of such *pretrial* matters as discovery" are sufficient to support an immediate appeal from "denial of a claim of qualified immunity" (citations and internal quotation marks omitted)); *Mitchell* v. *Forsyth*, 472 U. S. 511, 526 (1985) ("[E]ntitlement not to stand trial or face the other burdens of litigation . . . is effectively lost if a case is erroneously permitted to go to trial" (citing *Harlow, supra,* at 818)).

It is not surprising that the Court's immunity-related case law should rely on *both* distraction and distortion, for the ultimate rationale underlying those cases embodies both concerns. See *Pierson* v. *Ray*, 386 U. S. 547, 554 (1967) (absolute judicial immunity is needed because of "burden" of litigation, which leads to "intimidation"); *Bradley* v. *Fisher*, 13 Wall. 335, 349 (1872) (without absolute immunity a judge's "office [would] be degraded and his usefulness destroyed," and he would be forced to shoulder "burden" of keeping full records for use in defending against suits). The cases ultimately turn on an assessment of the threat that a civil damages lawsuit poses to a public official's ability to perform his job properly. And, whether they provide an absolute immunity, a qualified immunity, or merely a special procedure, they ultimately balance consequent potential public harm against private need. Distraction and distortion are equally important ingredients of that potential public harm. Indeed, a lawsuit that significantly distracts an official from his public duties can distort the content of a public decision just as can a threat of potential future liability. If the latter concern can justify an "absolute" immunity in the case of a Pres-

ident no longer in office, where distraction is no longer a consideration, so can the former justify, not immunity, but a postponement, in the case of a sitting President.

## III

The majority points to the fact that private plaintiffs have brought civil damages lawsuits against a sitting President only three times in our Nation's history; and it relies upon the threat of sanctions to discourage, and "the court's discretion" to manage, such actions so that "interference with the President's duties would not occur." *Ante,* at 708. I am less sanguine. Since 1960, when the last such suit was filed, the number of civil lawsuits filed annually in Federal District Courts has increased from under 60,000 to about 240,000, see Administrative Office of the United States Courts, Statistical Tables for the Federal Judiciary 27 (1995); Annual Report of the Director of the Administrative Office of the United States Courts—1960, p. 224 (1961); the number of federal district judges has increased from 233 to about 650, see Administrative Office of United States Courts, Judicial Business of United States Courts 7 (1994); Annual Report of the Director of the Administrative Office of the United States Courts—1960, *supra,* at 205; the time and expense associated with both discovery and trial have increased, see, *e. g.,* Bell, Varner, & Gottschalk, Automatic Disclosure in Discovery—The Rush To Reform, 27 Ga. L. Rev. 1, 9–11 (1992); see also S. Rep. No. 101–416, p. 1 (1990); Judicial Improvements Act of 1990, Pub. L. 101–650, 104 Stat. 5089; an increasingly complex economy has led to increasingly complex sets of statutes, rules, and regulations that often create potential liability, with or without fault. And this Court has now made clear that such lawsuits may proceed against a sitting President. The consequence, as the Court warned in *Fitzgerald,* is that a sitting President, given "the visibility of his office," could well become "an easily identifiable target for suits for civil damages," 457 U. S., at 753. The threat of sanctions

could well discourage much unneeded litigation, *ante,* at 708–709, but some lawsuits (including highly intricate and complicated ones) could resist ready evaluation and disposition; and individual district court procedural rulings could pose a significant threat to the President's official functions.

I concede the possibility that district courts, supervised by the Courts of Appeals and perhaps this Court, might prove able to manage private civil damages actions against sitting Presidents without significantly interfering with the discharge of Presidential duties—at least if they manage those actions with the constitutional problem in mind. Nonetheless, predicting the future is difficult, and I am skeptical. Should the majority's optimism turn out to be misplaced, then, in my view, courts will have to develop administrative rules applicable to such cases (including postponement rules of the sort at issue in this case) in order to implement the basic constitutional directive. A Constitution that separates powers in order to prevent one branch of Government from significantly threatening the workings of another could not grant a single judge more than a very limited power to second-guess a President's reasonable determination (announced in open court) of his scheduling needs, nor could it permit the issuance of a trial scheduling order that would significantly interfere with the President's discharge of his duties—in a private civil damages action the trial of which might be postponed without the plaintiff suffering enormous harm. As Madison pointed out in The Federalist No. 51: "The great security against a gradual concentration of the several powers in the same department consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others. *The provision for defense must in this, as in all other cases, be made commensurate to the danger of attack.*" *Id.,* at 321–322 (emphasis added). I agree with the majority's determination that a constitutional defense must await a more specific showing of need; I do not agree with what I

believe to be an understatement of the "danger." And I believe that ordinary case-management principles are unlikely to prove sufficient to deal with private civil lawsuits for damages unless supplemented with a constitutionally based requirement that district courts schedule proceedings so as to avoid significant interference with the President's ongoing discharge of his official responsibilities.

## IV

This case is a private action for civil damages in which, as the District Court here found, it is possible to preserve evidence and in which later payment of interest can compensate for delay. The District Court in this case determined that the Constitution required the postponement of trial during the sitting President's term. It may well be that the trial of this case cannot take place without significantly interfering with the President's ability to carry out his official duties. Yet, I agree with the majority that there is no automatic temporary immunity and that the President should have to provide the District Court with a reasoned explanation of why the immunity is needed; and I also agree that, in the absence of that explanation, the court's postponement of the trial date was premature. For those reasons, I concur in the result.