[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-14535
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 28, 2010
JOHN LEY
CLERK

D.C. Docket No. 1:04-cv-21448-ASG

In re:


USA,
U.S. ENVIRONMENTAL PROTECTION AGENCY,
REGIONAL ADMINISTRATOR, EPA, Region IV,
ADMINISTRATOR, EPA,


                                                      Petitioners.


_____

On Petition for Writ of Mandamus to the United States District Court for the
Southern District of Florida
_____


Before CARNES, PRYOR, and MARTIN, Circuit Judges.

PRYOR, Circuit Judge:

The Environmental Protection Agency petitions this Court for a writ of

mandamus to substitute the appearance of the Assistant Administrator for Water of

the Agency, Peter Silva, for the appearance of the Administrator of the Agency, Lisa Jackson, at a hearing about compliance by the Agency with orders entered by the district court that concern pollution of the Everglades. The district court denied the motion for substitution and ordered the appearance of the Administrator who is a high-ranking official of the executive branch. See 5 U.S.C. § 5313. The Agency argues that compelling a high executive official to appear in a judicial proceeding encroaches on the separation of powers and, absent exigent circumstances, the judicial branch must respect the discretion of the executive branch to designate which high-ranking official should represent the Agency in a judicial proceeding. The record establishes no special need for compelling the appearance of the Administrator; the Assistant Administrator is an adequate substitute. Because the district court abused its discretion by compelling the appearance of the Administrator, and there is no other adequate remedy available, we **GRANT** the petition for a writ of mandamus and direct the district court to allow the substitution.

## I. BACKGROUND

The Everglades is the largest subtropical wetlands in the United States. Its characteristic shallow and slow-moving waters once covered almost 11,000 square miles of southern Florida. This delicately balanced ecosystem, which developed

over thousands of years, has been disturbed in recent decades by economic development, and litigation about the pollution caused by that development is now common.  See, e.g., Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257 (11th Cir. 2009).

The waters of the Everglades naturally contain low levels of phosphorus and other nutrients, but water runoff from adjacent farms contains high levels of phosphorus.  Over time, this runoff has altered drastically the chemical composition of the surface waters of the Everglades.  The presence of phosphorus in these waters has caused the growth of non-native plant species, such as cattails, and the diminishment of native species, such as saw grass.

As part of the effort to preserve the natural qualities of water in the Everglades, the Florida Legislature enacted the Everglades Forever Act in 1994, Fla. Stat. § 373.4592.  The Florida Legislature amended the Act in 2003, 2003 Fla. Laws chs. 12, 394, and the Florida Department of Environmental Protection adopted a phosphorus rule in 2005, Fla. Admin. Code Ann. rr. 62-302.530, 62-302.540 (2005).  Both the amendment and the rule changed the standards for acceptable levels of phosphorus in the surface waters of the Everglades.

After the amendment of the Act and the adoption of the phosphorus rule, the Miccosukee Tribe of Indians of Florida and Friends of the Everglades filed

3

complaints against the United States, the United States Environmental Protection Agency, the Administrator of the Agency, and the Regional Administrator of the Agency. The complaints alleged violations of the Clean Water Act, the purpose of which is to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act requires each state to adopt water quality standards that must be submitted to the Agency for review. Id. § 1313(c). The Tribe and Friends of the Everglades challenged the determination of the Agency that the 2003 amendments to the Florida Act were not new or revised water quality standards subject to Agency review. They also challenged the approval of the phosphorus rule by the Agency.

The district court consolidated the cases in 2005. The Florida Department of Environmental Protection intervened as a party defendant because it is responsible for enforcement of the Florida Act. New Hope Sugar Company and Okeelanta Corporation, owners and farmers of about 190,000 acres of land in the Everglades, also intervened. Fed. R. Civ. P. 24(b).

In 2008, the district court granted summary judgment in favor of the Tribe and Friends of the Everglades. The district court ruled that the 2003 amendments to the Florida Act changed water quality standards and the Agency had a duty either to approve or disapprove those changes. The district court also ruled that

some of the provisions of the phosphorus rule were invalid. The district court concluded that the Agency had acted arbitrarily and capriciously by "allow[ing] 'Florida to radically modify its water quality standards, simply disavow that a change had taken place' and then 'rely on Florida's disavowal to avoid its mandatory review of the modified standards.'" As a result, the district court "exercise[d] its equitable powers to avoid environmental injury to the Everglades" and "enjoin[ed] the [Florida Department of Environmental Protection] from issuing permits [under] those sections of the phosphorus rule that [were] set aside."

On November 4, 2009, the Tribe and Friends of the Everglades moved to have the Agency held in civil contempt for failing to issue a new determination about whether the 2003 amendments or phosphorus rule complied with the Clean Water Act. On December 3, 2009, the Agency issued a new determination that disapproved several provisions of the 2003 amendments and the phosphorus rule, and the Agency responded that the new determination rendered moot the motion of the Tribe and Friends of the Everglades. The Tribe and Friends of the Everglades replied that the new determination failed to comply with the order of the district court and the Agency should be held in contempt.

On April 14, 2010, the district court ordered the Agency to issue an

5

"Amended Determination" that "direct[ed] the State of Florida to correct the deficiencies in the Amended [Florida Act] and the Phosphorus Rule," and the district court sua sponte ordered the Administrator, the Regional Administrator for Region IV, and the executive director of the Florida Department of Environmental Protection to appear at a hearing on October 7, 2010, about compliance with the order. The district court also reserved the right "to fully exercise its contempt power in the event full compliance is not met."

On July 29, 2010, the Agency moved to modify the injunction on the ground that the district court had ordered the Agency to act beyond its statutory authority, Fed. R. Civ. P. 60(b). All the defendants and all intervenors filed an appeal of the order of April 14. This Court stayed that appeal pending resolution of the motion to modify the injunction.

On September 3, 2010, the Agency filed its Amended Determination, and on September 8, 2010, the Agency moved for leave to substitute the appearance of the Assistant Administrator for Water for the appearance of the Administrator. The Administrator is a high-ranking official. She was appointed by the President and confirmed by the Senate, and she reports directly to the President. The Assistant Administrator for Water is the senior Agency official responsible for fulfilling the responsibilities of the Agency under the Clean Water Act. He was responsible for

preparing the Amended Determination and the response of the Agency to the order of April 14. Like the Administrator, he was also appointed by the President and confirmed by the Senate.

The district court orally denied the motion to substitute at the end of a telephone conference. During that conference the district court stated, "I think that the issues that I need to address at this hearing have to be done by the agency head on policy matters." The district court also stated that it was "committed to the course that [it had] adopted here without deviation." In a later written order, the district court ruled that "[d]efendants' request at this juncture to substitute [the Assistant Administrator] . . . for the Administrator is in direct violation of the April 14, 2010 Order and unacceptable." The district court faulted the defendants for waiting until one month before the hearing and found that the action involved extraordinary circumstances that required a personal response from the Administrator about "whether the strategies outlined in the Amended Determination are a sincere commitment or merely an empty shell." The court also observed that "the Everglades is of considerable national importance," and "[t]he Court must be able to make an intelligent inquiry regarding the [Agency's] position and policy matters, to be addressed by the [Agency] Administrator."

After the denial of its motion for substitution, the Agency filed a petition for a writ of mandamus in this Court. We stayed that portion of the contempt order that required the Administrator's personal appearance pending our decision on the mandamus petition. We invited, but did not require, the district court to address the petition. The district court responded, as it had every right to do, that any filing would be duplicative of its order of September 21, 2010, and referred us to that order in lieu of a response.

## II. STANDARD OF REVIEW

"Mandamus is an extraordinary remedy, and it is appropriate only when 'no other adequate means are available to remedy a clear usurpation of power or abuse of discretion by the district court.'" Carpenter v. Mohawk Indus., Inc., 541 F.3d 1048, 1055 (11th Cir. 2008) (quoting In re Loudermilch, 158 F.3d 1143, 1144 (11th Cir. 1998)).

## III. DISCUSSION

We have acknowledged that the compelled appearance of a high-ranking officer of the executive branch in a judicial proceeding implicates the separation of powers, and we have allowed an executive official to challenge an order compelling his appearance by filing a petition for a writ of mandamus without having to incur a contempt sanction. In re United States, 985 F.2d 510, 512–13

8

(11th Cir. 1993). In In re United States, defendants indicted for violations of prescription drug laws argued that they were being prosecuted selectively, and they subpoenaed the deposition testimony of the Commissioner of the Food and Drug Administration to support their defense. 985 F.2d at 511. The district court denied a motion to quash the subpoena and ordered the Commissioner to be available by telephone to testify for 30 minutes. Id. We granted a writ of mandamus to quash the subpoena of the Commissioner. Id. at 513.

We concluded that compelling the testimony of the Commissioner of the Food and Drug Adminstration "would have serious repercussions for the relationship between two coequal branches of government." Id. We allowed the Commissioner to obtain an extraordinary writ to avoid that encroachment of the separation of powers: "Requiring the . . . Commissioner to fight the subpoena by placing himself in contempt implicates separation of powers concerns and would harm the public perception of the [Administration]." Id. at 512. We explained that "[t]he Commissioner would have to take valuable time away from other tasks in deciding whether to incur the sanction of the court." Id. at 512. We also considered the obvious practical implications of requiring high government officials to appear in judicial proceedings: "If the Commissioner was asked to testify in every case which the [Administration] prosecuted, his time would be

9

monopolized by preparing and testifying in such cases." Id.

We must review the record to determine whether it supports a finding of extraordinary circumstances or a "special need" for compelling the appearance of a high-ranking officer in a judicial proceeding. Id. In In re United States, we concluded that the record failed to support a finding of special need for compelling the Commissioner to testify because the "record disclose[d] that testimony was available from alternate witnesses." Id. "We are, of course, bound to follow prior panel precedent that is on point." Nguyen v. United States, 556 F.3d 1244, 1257 (11th Cir. 2009).

Moreover, the decisions of several of our sister circuits follow our approach. Our sister circuits have allowed high-ranking officials to petition for a writ of mandamus in similar circumstances. See In re Cheney, 544 F.3d 311, 314 (D.C. Cir. 2008) ("[M]andamus may be warranted [to prevent] intrusive discovery against the Vice President."); In re SEC, 374 F.3d 184, 188 (2d Cir. 2004) ("[T]here is a marked difference between requiring a private litigant to submit to a contempt order before seeking appellate relief and requiring executive agency officials to do so . . . ."); In re United States, 197 F.3d 310, 314 (8th Cir. 1999) ("[T]he writ is the appropriate remedy when there are serious policy considerations . . . .") (internal quotation marks omitted); In re FDIC, 58 F.3d

10

1055, 1060 (5th Cir. 1995) ("[W]e grant the petition and order the magistrate judge to . . . grant the FDIC's motion to quash depositions."). And our sister circuits have required a showing of special need before compelling the appearance of a high-ranking officer. See In re Cheney, 544 F.3d at 314 ("The duties of high-ranking executive officers should not be interrupted by judicial demands for information that could be obtained elsewhere."); In re United States, 197 F.3d at 314 ("If other persons can provide the information sought, discovery will not be permitted against [a high-ranking government] official."); In re FDIC, 58 F.3d at 1060 ("We think it will be the rarest of cases . . . in which exceptional circumstances can be shown where the testimony is available from an alternate witness.")

The record establishes that the Agency reasonably offered the appearance of a high-ranking and knowledgeable official as a substitute for the Administrator's appearance. Like the Administrator, the Assistant Administrator for Water is appointed by the President and confirmed by the Senate. The Assistant Administrator for Water is the primary official responsible for fulfilling the national responsibilities of the Agency under the Clean Water Act, including the response of the Agency to the order of April 14 and the preparation of the Amended Determination. The Assistant Administrator for Water is not only a

11

higher-ranking official than the officials whose testimony was offered in <u>In re United States</u>, but he is the most knowledgeable official about the Amended Determination because he was responsible for its preparation.

The district court failed to explain what information the Administrator can provide or what special need she can satisfy by her appearance that the Assistant Administrator for Water cannot. The district court instead referred, in conclusory terms, to its authority to "pose direct questions to Defendants regarding whether the strategies outlined in the Amended Determination are a sincere commitment or merely an empty shell" and the need "to make an intelligent inquiry regarding the . . . position [of the Agency] and policy matters, to be addressed by the [Agency] Administrator." The district court stated that the Administrator had adequate time to prepare for the hearing, the protection of the Everglades is an issue of national importance, and the Agency has not complied with the earlier orders of the court, but none of those assertions explains why the Assistant Administrator is an inadequate substitute. The Assistant Administrator is charged with ensuring compliance with the order of April 14, has national responsibility for enforcement of the Clean Water Act, and is the official primarily responsible for the Amended Determination.

The threat to the separation of powers is more substantial here than in <u>In re</u>

12

United States.  The Administrator is a higher-ranking official than the Commissioner of the Food and Drug Administration, and we ruled that, absent exigent circumstances, compelling the Commissioner's testimony by telephone for 30 minutes disrespected the separation of powers.  In re United States, 985 F.2d at 512.  By contrast, compelling the personal appearance of the higher-ranking Administrator in a distant judicial district for interrogation by the court for an indefinite period is a far more serious encroachment on the separation of powers.

The Tribe and Friends of the Everglades argue that In re United States is distinguishable because a party, not the court, in that case, initially compelled by subpoena the appearance of the executive official, but that distinction is immaterial.  Compelling high executive officials to appear in a judicial proceeding implicates the separation of powers regardless of whether the appearance is compelled initially by a party or sua sponte by the court.  In either event, the appearance of the executive official must be, in the end, compelled by an order of the judiciary, which implicates the separation of powers.  For that reason, in both circumstances, there must be a showing of special need before a high-ranking executive official can be compelled by the judiciary to appear.

The Tribe and Friends of the Everglades also argue that In re United States is distinguishable because the Administrator is a named party, but we disagree.

13

The decisions we relied upon in In re United States all involved compelling the testimony of a high-ranking official where either the official or his agency was a party to the litigation. Id. at 512 (citing Simplex Time Recorder Co. v. Sec'y of Labor, 766 F.2d 575 (D.C. Cir. 1985); In re Office of Inspector Gen., 933 F.2d 276 (5th Cir. 1991); Sweeney v. Bond, 669 F.2d 542 (8th Cir. 1982); United States v. Merhige, 487 F.2d 25 (4th Cir. 1974); Peoples v. United States Dep't of Agric., 427 F.2d 561 (D.C. Cir. 1970)). We also explained that it would be impossible for high-ranking executive officials to attend proceedings in every judicial district in which they are named as parties: "In order to protect officials from the constant distraction of testifying in lawsuits, courts have required [a showing of] a special need or situation compelling such testimony." Id.

The Tribe and Friends of the Everglades argue that we should follow the decision in In re Kessler, 100 F.3d 1015 (D.C. Cir. 1997), and not issue the writ, but our precedent in In re United States squarely forecloses that argument. In In re Kessler, the District of Columbia Circuit denied a petition for writ of mandamus after the Commissioner of the Food and Drug Administration had been compelled to submit to a deposition. Id. at 1018. The Kessler court declined to follow our precedent in In re United States on the ground that our decision "did not take into account sufficiently the constitutional distinction between the President himself

14

and subordinate officers in the executive branch." Id. at 1017. "The fact that other circuits disagree with [our] analysis is irrelevant." EEOC v. W & O, Inc., 213 F.3d 600, 623 n.15 (11th Cir. 2000). We are bound by a prior panel decision of this Court unless and until that panel decision is overturned by this Court en banc or by the Supreme Court. Id.

Moreover, it is unclear that the Kessler court would have denied a writ in this circumstance. The Kessler court made much of the relatively low position that the Commissioner holds in the executive branch: "Executive Level IV is the journeyman level of those appointed by the President and confirmed by the Senate." In re Kessler, 100 F.3d at 1017. The Kessler court was concerned that there was no meaningful way to distinguish the Commissioner of the Food and Drug Administration from the over 350 other Level IV appointees. Id. at 1018. By contrast, the Administrator is one of the highest officials of the executive branch. See 5 U.S.C. § 5313. The concerns that motivated the decision in Kessler are not present here.

The Tribe and Friends of the Everglades finally argue that the Agency waited too late to move for substitution, but the Agency filed its motion within one week after it had filed its Amended Determination and a full month before the hearing where the Administrator was to appear. We cannot say that this delay was

15

unreasonable, and the Tribe and Friends of the Everglades have not cited any authority for the proposition that a district court should deny a motion for substitution if it is not brought at the earliest possible time. The district court also failed to identify any prejudice to its proceeding caused by the delay by the Agency.

On the record before us, we cannot conclude that there is a special need for the Administrator's appearance. The district court, without sufficient reason, sought to determine the priorities for a high-level executive official and clearly encroached on the discretion vested in the executive branch. We are mindful that the ecology of the Everglades is a national priority, but it cannot be said that the Everglades is the only matter of national importance demanding the Administrator's attention.

The dissent expresses disagreement with our decision not by addressing our reasoning, but by changing the subject. The dissent argues that the "blatant unwillingness [of the Agency] to abide by the court's commands" is sufficient to constitute extraordinary circumstances, but whether the Agency has complied with earlier orders is not an issue before us. As we explained, the Agency has appealed the order of April 14 to this Court, and this panel does not have the jurisdiction to decide that appeal. We cannot prejudge whether the Agency is in compliance with

the summary judgment, and the whole point of the hearing where the Administrator was being compelled to appear was to determine whether the Amended Determination would bring the Agency into compliance with the order of April 14. The dissent states that "we must take the findings of the district court as we receive them," but the order of April 14, which again is on appeal, is not a final judgment with res judicata effect, as the dissent erroneously suggests.

The threat to the separation of powers presented by this petition is not about whether the Agency is in compliance with either the summary judgment or the order of April 14, but is instead about whether the judicial branch has the authority to determine for the executive branch which high-ranking official should appear at a hearing to represent the Agency. The Agency did not threaten the judicial branch by designating the Assistant Administrator to appear before the district court. The record establishes that the Agency respectfully offered a presidential appointee, who is knowledgeable about the Amended Determination and is fully capable of addressing the needs of the district court, to serve as an adequate substitute for the Administrator. Nor did the Agency undermine the authority of the district court to determine whether the Agency has complied with the order of April 14. At the end of the hearing, the district court will still have the authority to decide that question. The Agency instead exercised its prerogative, as an

17

independent branch, to designate which of its high-ranking officials should appear as its representative in a proceeding of the judicial branch. That decision leaves intact the authority of the judicial branch to decide the "case" or "controversy" before it, which is all the authority that Article III of the Constitution grants the "least dangerous" branch. See The Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

The dissent confuses the issue when it suggests that the Agency "comes before this Court requesting the extraordinary remedy of mandamus to save them from the consequences of their own extraordinary noncompliance." All the Agency has done is request respect for its decision to allow a knowledgeable presidential appointee, instead of the Administrator, to appear on its behalf in the district court. That substitution does not in any way "save" the Agency from any consequences. The Agency will still have to answer for its alleged noncompliance, which is why the dissent is wrong to suggest that our decision "means we are powerless to enforce our judgments." Our decision is not about that issue.

The dissent faults us for "confin[ing] our review of the record to the four corners" of the order that denied the motion to substitute, but that criticism is without merit. We invited the district court to file a response to the petition for a

18

writ of mandamus filed by the Agency and the Administrator, but the district court declined to do so and instead referred us to the very order that the dissent faults us for relying upon too heavily. We reviewed both that order and the transcript of the conference that the district court held on the motion to substitute at which the district court also offered an explanation of its decision. We reviewed those portions of the record because they are the only places where the district court offered any explanation for its decision. We also reviewed everything that the parties cited against and in support of the decision of the district court. What we have not done is use a lengthy record as an excuse for not supplying a rationale that can in any way support the decision of the district court.

The dissent cites United States v. Morgan, 313 U.S. 409, 61 S. Ct. 999 (1941), as "binding authority," but Morgan supports our decision to grant a writ of mandamus. In that case, the Secretary of Agriculture's appearance was compelled over the objection of the government. Id. at 421–22, 61 S. Ct. at 1004–05. The Supreme Court, after deciding the merits of the litigation about an order by the Secretary, sua sponte turned its attention to "a matter not touching the validity of the order [but nonetheless] requir[ing] consideration." Id. at 421, 61 S. Ct. at 1004. The Court then condemned, in the following strong terms, the decision to compel the Secretary to appear and testify in the district court: "the short of the

19

business is that the Secretary should never have been subjected to this examination," because "it was not the function of the court to probe the mental processes of the Secretary." Id. at 422, 61 S. Ct. at 1004 (quoting Morgan v. United States, 298 U.S. 468, 480, 56 S. Ct. 906, 911 (1936)). Morgan suggests that a district court should rarely, if ever, compel the attendance of a high-ranking official in a judicial proceeding, which is why we relied upon it in In re United States. Morgan does not suggest or even hint that a federal district court should ever compel a member of the President's cabinet or another high-ranking official to appear in a judicial proceeding to testify about the official's duties or decisions.

The dissent also cites Clinton v. Jones, 520 U.S. 680, 117 S. Ct. 1636 (1997), but that decision does not support the position of the dissent. Clinton involved the extent of official immunity granted to the President when sued in his individual capacity, while in office, for conduct that occurred before he took office. Although the Court held that the President was not entitled to official immunity in that circumstance, the Court stated that it was not "confront[ing] the question whether a court may compel the attendance of the President at any specific time or place." The one thing that the Court explained in Clinton that is relevant to this case is that, "if a trial is held, there would be no necessity for the President to attend in person, though he could elect to do so." Id. at 691–92, 117

20

S. Ct. at 1643. In contrast with <u>Clinton</u>, the Administrator is not being sued in her individual capacity about conduct that occurred before she took office nor are principles of qualified immunity raised by this petition. The Administrator was instead compelled by the district court to appear in a judicial proceeding about her public duties even though the record discloses that another high-ranking official is available to serve as an adequate substitute.

The dissent also glosses over our precedent in <u>In re United States</u> where we decided two separate issues: (1) that mandamus is available to review an order compelling the appearance of the Commissioner in a judicial proceeding; and (2) that there is no special need for the Commissioner's appearance and the writ should be granted when "[t]he record discloses that testimony [is] available from alternate witnesses." 985 F.2d at 512. The dissent fails to acknowledge the basis for our resolution of the second issue. The dissent instead obliquely states that "the facts of that particular case" did not establish a special need for the Commissioner's testimony without acknowledging that the basis for that ruling was that the requested testimony was available from other witnesses.

The dissent fails to address the only issue before us: whether the district court abused its discretion by determining that the Assistant Administrator for Water is an inadequate substitute for the Administrator. The dissent fails to

21

explain how compelling the Administrator to appear satisfies a special need for the hearing to be held in the district court. The dissent fails to explain what information the Administrator can provide the district court that the Assistant Administrator cannot. The dissent fails to cite even a single decision of a circuit court that has upheld an order compelling a high-ranking official of the executive branch to appear in a judicial proceeding.

The district court abused its discretion when it denied the motion to substitute. The Agency reasonably designated the Assistant Administrator, who is primarily responsible for enforcement of the Clean Water Act and compliance with the orders of the district court, to appear on its behalf in the district court. Absent evidence that the Assistant Administrator's appearance will fail to satisfy any special need of the district court, we cannot conclude that the appearance of the Administrator is necessary.

## IV. CONCLUSION

Because there is no other adequate remedy available to remedy the abuse of discretion by the district court, the petition for a writ of mandamus is **GRANTED**, and the district court is directed to allow the substitution of the appearance of the Assistant Administrator for Water of the Agency for the appearance of the Administrator of the Agency.

MARTIN, Circuit Judge, dissenting:

I cannot agree that the circumstances of this case justify the majority's issuance of a writ of mandamus, which has the extraordinary effect of compelling a United States District Judge to receive a witness other than the one he believed necessary to address compliance with Orders he issued in this prolonged litigation. To be sure, I agree with the majority that "the compelled appearance of a high-ranking officer of the executive branch in a judicial proceeding implicates the separation of powers," and I thus agree that such an order is appropriate in very limited circumstances. However, given the EPA's continued failure to comply with the district court's mandates, such circumstances are present in this case. As a result, I find no abuse of discretion by the district court, and would deny mandamus relief.

In deciding the important question before us, the majority would confine our review of the record to the four corners of Judge Gold's Order of September 21, 2010, in which he denied the EPA's request to substitute an Assistant Administrator as a witness, when he had ordered the appearance of the Administrator. This Order, says the majority, does not contain a sufficient explanation for why the Assistant Administrator won't do. To arrive at this conclusion, however, requires turning a blind eye to at least two realities. First,

23

Judge Gold has presided over this case since it was filed on June 17, 2004, and has written extensively about the EPA's failure to heed his orders. Second, in his September 21 Order, Judge Gold makes repeated reference to the history of this case, previous orders of the court, conversations had with counsel, and generally, the background which led him to require the presence of the EPA Administrator in the first place. Thus his look back over the history of this case is very much a part of his explanation for requiring the presence of the Administrator.

In its Order of April 14, 2010, the district court set out in extensive detail that the EPA has unequivocally and repeatedly flouted and otherwise refused to comply with the court's previously entered Summary Judgment order. As the April Order explained, on July 29, 2008, the district court issued a 101-page Order holding the EPA in violation of the Clean Water Act and prescribing directives to remedy those violations. Yet extraordinarily, over one year later the EPA had still not acted, and ultimately did not act until November 4, 2009, after the plaintiffs filed a motion for contempt. Furthermore, as the district court took great pains to explain, the substance of the EPA's 2009 Determination flatly contravened the 2008 Summary Judgment Order. In the face of this inaction, the court warned that nothing short of the "effective[] repeal of [a] clearly expressed Congressional mandate" was at stake.

Determined to enforce its mandate but confronted by what it viewed as remarkable disobedience, the district court thus "face[d] the difficult task of avoiding both remedies that may be too intrusive . . . and those that may prove to be ineffective." NAACP v. Sec'y Hous. & Urban Dev., 817 F.2d 149, 159 (1st Cir. 1987). After careful deliberation, the court concluded that to remedy the EPA's disregard of the Summary Judgment order, it was necessary for the Administrator of the EPA to appear and update the court on the Agency's progress towards compliance. The court then set the date of this appearance to be six months after the order issued.

In September, five months after issuance of the April 14 Order, and only one month before the Administrator was to appear, the EPA moved to substitute an alternative representative in the place of the Administrator. The district court denied this motion, explaining:

> [T]his case . . . presents extraordinary circumstances and a special requirement for the Administrator's attendance. A review of the lengthy record in this case reveals the significant need for Defendants to present the Administrator, Regional Administrator, and FDEP Secretary at a hearing to ensure the Defendants are complying with the previously issued orders. As demonstrated by the record, Defendants have not complied with the orders, and therefore, it is necessary for the Administrator, Regional Administrator, and FDEP Secretary to personally appear and report to the Court on their compliance efforts, as outlined by the April 14, 2010 Order.

25

The court further explained, "[a]s outlined by lengthy opinions in the record, this case has a long history of extraordinary circumstances demonstrating a very special need for compliance with this Court's orders."

The EPA now comes before this Court requesting the extraordinary remedy of mandamus to save them from the consequences of their own extraordinary noncompliance. I would deny that request. Mandamus is "appropriate only when no other adequate means are available to remedy a clear usurpation of power or abuse of discretion by the district court." Carpenter v. Mohawk Indus., Inc., 541 F.3d 1048, 1055 (11th Cir. 2008). Indeed, mandamus "is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." Cash v. Barnhart, 327 F.3d 1252, 1258 (11th Cir. 2003). As a result, "[t]he petitioner seeking the writ carries the burden of showing that its 'right to the issuance of the writ is clear and indisputable.'" Carpenter, 541 F.3d at 1055 (quoting In re Lopez-Lukis, 113 F.3d 1187, 1188 (11th Cir. 1997)). Our precedent does not permit me to conclude that the district court judge has failed to perform a nondiscretionary function imposed upon him by law, such that the issuance of a writ of mandamus is justified. Nor do I believe that the Administrator has carried the heavy burden required to justify

our mandating how a United States District Judge manages the parties to litigation before him.

Both precedent and prudence support the district court's actions. The record below is replete with examples of the EPA's failure to comply with the court's orders. Faced with such recalcitrance, the court properly relied upon the long recognized inherent authority of district courts to enforce their mandates. See, e.g., Chambers v. Nasco, Inc., 501 U.S. 32, 43, 111 S. Ct. 2123, 2132 (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.") (quoting Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 227 (1821)). Indeed, more than permissible, the district court's actions were consistent with our prior instructions regarding the duties of the Judiciary. As we have explained, "[f]ederal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out their Article III functions." Martin-Trigona v. Shaw, 986 F.2d 1384, 1386–87 (11th Cir. 1993) (quoting Procup v. Strickland, 792 F.2d 1069 (11th Cir. 1986) (en banc)). Thus, although compelling the

Administrator to appear is extraordinary, it is in my view less so than the EPA's

blatant unwillingness to abide by the court's commands.[1]

Extraordinary or not, however, the district court's order for the

Administrator to appear is supported by binding authority.[2]  First, in United States

v. Morgan, 313 U.S. 409 (1941), a case which undergirds this Court's decision in

In re United States, 985 F.2d 510, 512 (11th Cir. 1993),[3] the Secretary of

Agriculture was not only subjected to deposition, over the government's objection,

for proceedings in which he was a party, but also "appeared in person at the trial."

---

[1] Although the underlying merits of the Summary Judgment Order may eventually be addressed on appeal, at this stage we must take the findings of the district court as we receive them.  See Jaffree v. Wallace, 837 F.2d 1461, 1467 (11th Cir. 1988) ("'The established rule in the federal courts is that a final judgment retains all of its res judicata consequences pending decision of the appeal.'" (quoting 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* sec. 4433, at 308 (1981 & Supp. 1987))).

[2] As the majority implies, we are bound only by Supreme Court precedent and the holdings of this Court.  Thus, while I agree that we ought to respect our sister circuit's precedent as persuasive, that authority does not control.  In any event, because no circuit has analyzed a district court's powers to compel witnesses in the context of recalcitrance at the level of the EPA's in this case, the majority's out-of-circuit precedent is distinguishable on its facts.

[3] In In re United States we cited Morgan for the proposition that "the practice of calling high officials should be discouraged."  985 F.2d at 512.  However, this description expands upon what that case actually stands for.  In fact, rather than discouraging the practice of soliciting testimony from high level officials generally, the Court in Morgan actually critiqued subjecting the Secretary to testifying because of his role *in that case*.  As the Court explained, the underlying litigation concerned a "proceeding before the Secretary [that] 'has a quality resembling that of a judicial proceeding.'" 313 U.S. at 422 (quotation omitted).  This being so, the Court reasoned that "[j]ust as a judge cannot be subjected to such scrutiny . . .  so the integrity of the administrative process must be equally respected."  Id. (citation omitted).  Thus, Morgan actually discourages soliciting testimony from high level officials when they serve in a judicial capacity.

28

Morgan, 313 U.S. at 422.  While there, "[h]e was questioned at length regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultations with subordinates."  Id.  That the Secretary *actually testified* undermines—fatally in my estimation—the government's fears about the ability of the Administrator to both appear as a witness in extraordinary cases and also "fulfill her role as a cabinet officer."

Second, "it is . . . settled that [even] the President is subject to judicial process in appropriate circumstances."  Clinton v. Jones, 520 U.S. 681, 703 (1996) (discussing Chief Justice Marshall's "ruling that a subpoena *duces tecum* could be directed to the President" (citing United States v. Burr, 25 F. Cas. 30 (No. 14,692d) (C.C. Va. 1807))).  As a result, the majority "errs by presuming that interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions."  Clinton v. Jones, 520 U.S. at 702.  To the contrary,

> As Madison explained [in Federalist 47], separation of powers does not mean that the branches "ought to have no *partial agency* in, or no *controul* over the acts of each other."  The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly

29

burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution.

Id. at 703 (quotation omitted) (emphasis in original). Surely, if this burden can be exerted upon the Chief Executive, then it necessarily follows that Cabinet level officials can be so burdened as well.

Finally, in light of the extensive disobedience displayed by the EPA, I would hold that this case presents the exigency that In re United States requires in order to compel the testimony of high ranking officials. 985 F.2d at 512. In that case, the Commissioner of the Food and Drug Administration resisted a subpoena to appear as a witness in a prosecution of two criminal defendants who were accused of violating various drug regulations. Id. at 511. We recognized that the normal means to fight such a subpoena would be for the Commissioner to disregard it and place himself in contempt, but explained that doing so would "implicate[] separation of powers concerns," distract the Commissioner from his other responsibilities, "harm the public perception of the FDA," and "prolong the litigation of this tangential issue and delay the trial of the underlying criminal offense." Id. at 512. As a result, we held "that a writ of mandamus, *if warranted*, is the appropriate remedy." Id. (emphasis added).

By the plain text of the opinion, then, we cautioned that mandamus is not appropriate in all instances in which a high level official is called to testify. Instead, we explained that mandamus would be warranted only where "extraordinary circumstances or a special need for the [high level official's] testimony" could not be identified. Id. We concluded that the facts of that particular case did not present such circumstances, and as a result afforded mandamus relief. Id. at 512–13.

As discussed above—and at length by the district court—such extraordinary circumstances are present here. In any other case, we would impose nothing short of the harshest sanctions against a private party that behaved in a manner analogous to the EPA. Indeed, I would be shocked if the only intermediate consequence to befall a corporation that so brazenly disobeyed a federal court Order was that its CEO was directed to testify about future compliance efforts. But regardless of any other consequences, it is clear that the entity's most senior managing official is the appropriate individual to speak towards future compliance efforts. As a result, I cannot conclude that the district court abused its discretion in requiring the Administrator to appear. An abuse of discretion warranting mandamus occurs when a court commits "[a] clear error of judgment or application of an incorrect legal standard." Mohawk Indus., 541 F.3d at 1055.

31

Judge Gold has done neither.

I am well aware that the offending party is a government agency, and so normal remedies must be evaluated in the context of the separation of powers. Yet, to conclude that respect for a co-equal branch means we are powerless to enforce our judgments turns the doctrine of separation of powers on its head. Thus, I find it perplexing that our fidelity to the notion of separation of powers has led the members of this panel to reach different conclusions. To be sure, I agree that "[t]he threat to separation of powers is more substantial here than in In re United States." But I view the proper remedy to that threat as the district court's subpoena, which is the appropriate check through which to restore the delicate balance between the Executive and the Judiciary. See The Federalist No. 51, at 286 (Alexander Hamilton) (E.H. Scott ed., 1898) ("[T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means, and personal motives, to resist encroachments of the others."); accord Clinton v. Jones, 520 U.S. at 699 n.30 (quoting same).[4] Because instead the

─────────────────────

[4] I read Federalist No. 78 to also support denying mandamus relief in this case. In describing the "least dangerous" branch, Federalist No. 78 emphasizes the inherent weaknesses of the Judiciary. See The Federalist No. 78, at 425–26 (Alexander Hamilton) (E.H. Scott ed., 1898). Rather than praise these weaknesses, however, the text states that "all possible care is requisite to enable it to defend itself against . . . attacks" from the other branches. Id. at 425. In my view, therefore, Federalist No. 78 cuts squarely *against* reversing the district court.

32

majority elects to exacerbate that threat while at the same time weakening the

extraordinary nature of mandamus, I respectfully dissent.